Anne E. Findling, Esq. (010871)
Lauren E. Channell, Esq. (033484)
**ROBBINS & CURTIN, p.l.l.c.**
301 East Bethany Home Road, #B-100
Phoenix, Arizona 85012
Tel: 602-285-0100
Fax: 602-265-0267
anne@robbinsandcurtin.com
lauren@robbinsandcurtin.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Brittney Fountain, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>State of Arizona, a body politic; Jason McClelland, an individual, on his own behalf and on behalf of his marital community; and Jeffrey Van Winkle, an individual, on his own behalf and on behalf of his marital community,<br><br>Defendants. | No. 2:21-cv-00356-JJT<br><br>**FIRST AMENDED COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiff Brittney (Goodman) Fountain complains against Defendants and alleges as follows:

**PARTIES**

1. Brittney (Goodman) Fountain, (hereinafter "Plaintiff") is a female resident of the State of Arizona.

2. Plaintiff, at all times alleged herein, was a correctional officer employed by the Arizona Department of Corrections ("ADOC").

3. Defendant State of Arizona is a governmental entity organized under the

Constitution of the United States. Its subdivisions or agencies include ADOC.

4. Defendant Jason McClelland, at all times alleged herein, was a correctional sergeant employed by ADOC and was acting within the course and scope of his employment and under the color of state law. He is, and was, a "state actor" as that term is used under the jurisprudence of 42 U.S.C. § 1983.

5. Defendant Jeffrey Van Winkle, at all times alleged herein, was employed by Defendant State of Arizona as the Warden for Arizona State Prison Complex ("ASPC") – Florence Central Unit and was acting within the course and scope of his employment and under the color of state law. He is, and was, a "state actor" as that term is used under the jurisprudence of 42 U.S.C. § 1983 and was a final policymaker responsible for making and enforcing official policies at ASPC – Florence Central Unit.

6. Defendant State of Arizona, at all times alleged herein, is and was a "person" and "employer" as defined under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended.

7. Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended, Defendant State of Arizona is vicariously liable for the acts and omissions of ADOC employees with supervisory authority, including Defendant Jason McClelland and Defendant Jeffrey Van Winkle.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331.

9. Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

10. All conditions precedent to the institution of this suit have been fulfilled and Plaintiff has satisfied all jurisdictional prerequisites to the maintenance of this action.

11. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about October 23, 2020. The EEOC issued a

Notice of Right to Sue on January 14, 2021, and this action has been filed within ninety (90) days of receipt of said notice.

## DEMAND FOR JURY TRIAL

12. Plaintiff demands a jury trial as to all triable issues.

## GENERAL ALLEGATIONS

**A. Defendant McClelland had a longstanding history of sexually harassing his female coworkers and subordinates, which was common knowledge among command staff and supervisors at ASPC – Florence Central Unit.**

13. Defendant Jason McClelland was hired by ADOC as a correctional officer in approximately 2014 and worked primarily at the ASPC – Florence Central Unit in Florence, Arizona.

14. ADOC promulgates Departmental Orders (D.O.) that govern the conduct of employees of the Department.

15. ADOC promulgated D.O. 501, Employee Professionalism, Ethics and Conduct that imposes an affirmative responsibility on all employees to "immediately report misconduct to their chain of command."

16. Department Order 501 also imposes an affirmative responsibility on all employees to report "[c]riminal activity involving employees as suspects or victim" to local law enforcement having jurisdiction.

17. ADOC promulgated D.O. 523, Domestic and Workplace Violence that imposes an affirmative responsibility on all employees who witnesses "the threat or assault of another employee, while at work" to report to his/her supervisor and to write an informational report.

18. On information and belief, Defendant McClelland began making inappropriate sexual advances toward his female coworkers, including correctional officers as well as medical staff who worked for the prison's healthcare contractor, shortly after he began his employment with ADOC.

19. On information and belief, other employees of ADOC either witnessed, were informed, or otherwise became aware of the acts of Defendant McClelland, triggering an affirmative duty to report the conduct.

20. In approximately August 2014, Defendant McClelland made inappropriate sexual advances toward a female correctional officer, telling her he was going to kiss her.

21. Defendant McClelland cornered the correctional officer while she was posted in a secluded area and stated, "I'm here for my kiss."

22. Despite the officer's attempts to rebuff Defendant McClelland, he kept coming closer and insisting on kissing her, but another correctional officer entered the area and interrupted Defendant McClelland before he made contact with the victim.

23. On information and belief, ADOC did not reprimand Defendant McClelland or take any action against him following this incident.

24. Defendant McClelland was eventually promoted to the rank of sergeant and became a corrections supervisor.

25. Defendant McClelland was also a member of the Tactical Support Unit (TSU) which is an elite group of correctional officers, at times thought of as a "S.W.A.T. team" for prisons. This specialized unit is called out to respond to crises, and its members are specially trained and generally held in high regard by their co-workers and prison staff.

26. ADOC provided the TSU members with access to restricted areas within the prison worksite, including a designated "TSU Building," also known as "the Dorm," and an adjacent structure known as the "Commander's Room."

27. As a sergeant and member of the TSU, Defendant McClelland was given access to the TSU areas, including the TSU Building and the Commander's Room.

28. Defendant McClelland sexually assaulted at least two of his victims, including Plaintiff, in the TSU Building or Commander's Room.

29. On information and belief, it was well known among prison staff, including other sergeants and supervisory personnel, that Defendant McClelland was overly flirtatious

and inappropriate in the workplace and that he had sexual relationships with several staff members over the years.

30. It was also well known among staff that Defendant McClelland would prey on young female staff members who he perceived to be vulnerable and easy to coerce and that he would not accept "no" for an answer.

31. On information and belief, several corrections and medical staff members resigned or sought transfers to other prisons after being victimized by Defendant McClelland in the workplace.

32. However, Defendant McClelland was popular, well liked, and respected among the command staff at ASPC – Florence Central Unit, and the "boys will be boys" culture that existed within the prison allowed his sexual proclivities to go unchecked.

33. On information and belief, Defendant McClelland would use his authority and his position as a sergeant and supervisor to ensure he knew where and when his victims would be working and would ensure that he was assigned to work near them.

34. On information and belief, Defendant McClelland would determine whether his victims would be working alone or stationed in secluded areas of the prison, and he would seize the opportunity to corner them when no one else was around.

35. Defendant McClelland also used ADOC's computer system to obtain his victims' personal phone numbers, which he would use to call and text them without their consent.

**B. Defendant McClelland used his rank and authority to sexually assault Plaintiff in the workplace.**

36. In approximately June 2018, Plaintiff was hired by ADOC as a correctional officer and began working at ASPC – Florence Central Unit.

37. Defendant McClelland, as a sergeant, had immediate supervisory authority over Plaintiff and had the ability to take tangible employment actions against her.

38. In January or February 2019, Plaintiff was working the Main Control at Kasson Unit at ASPC – Florence Central Unit.

39. Defendant McClelland entered the room, sat down behind Plaintiff, grabbed her breast over her shirt, and asked her if her nipples were pierced.

40. Defendant McClelland continued to touch Plaintiff's breasts then undid his pants, exposed himself, and placed Plaintiff's hand on his penis.

41. Plaintiff pulled her hand away, but Defendant McClelland continued to grope her breasts.

42. Defendant McClelland went to the back of the Control Room behind some cabinets and told Plaintiff to come to him, which Plaintiff refused to do.

43. Defendant McClelland then grabbed Plaintiff's hand and pulled her behind the cabinets, where he began to kiss her and used his fingers to sexually assault her.

44. Defendant McClelland turned Plaintiff around to face the wall, which caused her to fear that Defendant McClelland would attempt to have intercourse with her; however, another correctional officer entered the Sally Port, which was just outside the Control Room, and Defendant McClelland stopped.

45. During another incident in approximately September 2019, Defendant McClelland took Plaintiff into the TSU Building because he knew that she was seeking a position on the TSU Unit and wanted her "to see what she would be part of."

46. Defendant McClelland showed Plaintiff around the TSU Building and then took her to the Commander's Room, which had two bunk beds and a single bed.

47. Defendant McClelland turned off the lights and blocked the door with his body, preventing Plaintiff from leaving.

48. Defendant McClelland then removed Plaintiff's clothing and had nonconsensual sexual intercourse with her.

49. Plaintiff did not immediately report the assaults out of concern and fear of retaliation. Because Defendant McClelland was so favored and well-liked among the prison staff, Plaintiff was concerned that others would not believe her or would retaliate against her if she reported the incidents and would refuse to have her back or come to her aid if she encountered a dangerous situation with an inmate.

**C. Defendant McClelland and other staff created a hostile work environment where Plaintiff was subjected to egregious and humiliating harassment for months.**

50. Shortly after these assaults occurred, Defendant McClelland began to spread rumors about Plaintiff around the prison complex, suggesting that Plaintiff had willingly "hooked up" with him and was sexually promiscuous.

51. Other male staff members began to verbally harass Plaintiff. They would call her a liar and make harassing comments, such as "I heard you like to fuck sergeants."

52. On one occasion, a newly promoted sergeant named Mallaire offered Plaintiff a $300.00 check in exchange for a date, rather than report or correct Defendant McClelland's harassment, which ADOC policy required him to do. Plaintiff declined.

53. Because of the rumors and sexual harassment, Plaintiff's reputation was damaged, and she was not considered part of the "team" by many of her peers.

54. Plaintiff became concerned for her personal safety in the prison because the two shift lieutenants (one of whom also had a history of sexually harassing subordinates) openly favored Defendant McClelland, and Plaintiff worried that no one would come to her aid if there was an issue with an inmate.

55. Plaintiff felt that formally reporting the abuse and harassment would be futile, and would likely result in retaliation against her, because of ADOC's "informal resolution" policy.

56. ADOC's "informal resolution" policy allowed supervisors to dispose of paperwork or complaints written about them or alter the documents to benefit themselves. When a situation such as harassment was reported, the "informal resolution" process allowed supervisors to manipulate the outcome to their liking and consider the matter resolved while not documenting (or inaccurately documenting) the matter to claim probable deniability later.

57. Plaintiff did not feel safe or confident in her team or staff because of the favoritism shown to Defendant McClelland, the "good ol' boys" culture at the prison, and the continuous character assassination and sexual harassment to which she was subjected.

58. In late October 2019, Plaintiff left the ASPC – Florence complex to join the Correctional Officer Training Academy ("COTA") in Tucson.

59. After her transfer to COTA, Defendant McClelland continued to email and contact Plaintiff.

60. Defendant McClelland worded his emails to sound as though Plaintiff was in a relationship with him, which was false.

61. Plaintiff believed that Defendant McClelland's objective in sending the emails was to protect himself against any accusations or investigations into his behavior.

62. In December 2019, Plaintiff was restationed at ASPC – Florence Central Unit after she graduated from COTA, and prison staff once again began to harass her.

63. Meanwhile, from late 2019 through 2020, Defendant McClelland engaged in the sexual assault and harassment of at least three other female prison employees, one correctional officer (who was also his subordinate) and two nurses who worked for the prison healthcare contractor.

64. In approximately February 2020, Defendant McClelland sexually assaulted a correctional officer, K.S., in the workplace on three occasions.

65. After one incident, Defendant McClelland verbally proclaimed he was going to marry K.S. and placed his hand on her shoulder in the presence of another sergeant, Sergeant Rodriguez, and two other corrections officers.

66. On information and belief, Sergeant Rodriguez did not report or correct McClelland's conduct toward K.S.

67. Meanwhile, from approximately February 2019 through April 2020, Defendant McClelland persistently harassed a nurse, M.C., who worked for the prison's health care contractor. He attempted to lure her to the TSU building on more than one occasion, and he struck her buttocks in approximately February 2020.

68. In March 2020, Defendant McClelland verbally sexually harassed M.C. in the presence of another sergeant, Sergeant Pisano, but Sergeant Pisano did not correct or report the harassment.

**D. The hostile work environment escalated in intensity after Plaintiff reported the sexual abuse and harassment.**

69. On July 15, 2020, the ADOC Criminal Investigations Unit ("CIU") began investigating Defendant McClelland after a nurse at the prison, M.F., reported that he had sexually assaulted her.

70. At that time, Plaintiff and several other female corrections and medical employees came forward to report their experiences of being harassed or assaulted by Defendant McClelland.

71. The CUI investigator, Daniel Root, interviewed Plaintiff.

72. After the interview, Plaintiff was required to continue working her regular shifts.

73. Prison management, including Defendant Van Winkle, allowed Defendant McClelland to continue working at the ASPC – Florence Central Unit without restrictions while the investigation ensued.

74. Defendant McClelland was popular and well liked and he had overwhelming support from other staff members during the investigation, which further contributed to creating an unsafe and hostile work environment for Plaintiff.

75. While the CIU investigation against him was underway, Defendant McClelland told Lieutenant Garrett that if "these bitches" ruined his life, he would kill them.

76. On information and belief, neither Lieutenant Garrett nor any other supervisor admonished Defendant McClelland for making the threat or immediately reported and documented the threat. No one informed Plaintiff that she had been the subject of a death threat.

77. ADOC ultimately decided to transfer Defendant McClelland to another complex, ASPC – Eyman, where he was to remain in a supervisory position without restrictions.

78. On August 6, 2020, Defendant McClelland was arrested.

79. On information and belief, at some point near the time of Defendant McClelland's arrest, Defendant Van Winkle and Defendant McClelland had a conversation during which Defendant Van Winkle indicated that he would stand by and support Defendant McClelland.

80. On information and belief, Defendant McClelland communicated the substance of his conversation with Defendant Van Winkle in a phone call from jail that was recorded.

81. After the arrest, the prison staff's harassment of Plaintiff began to escalate.

82. People began to post news articles about the arrest to Plaintiff's social media page, many of whom were unaware that Plaintiff was one of the victims.

83. The ASPC – Florence Warden, Defendant Jeffrey Van Winkle, contacted Plaintiff's investigator and told him to let Plaintiff know he had people watching her social media and threatened to bring Plaintiff to his office and reprimand her if she did not stay off social media.

84. Plaintiff was also given a directive that she was not allowed to discuss the investigation with anyone, yet her co-workers were not given the same directive and were able to discuss the matter freely.

85. Defendant Van Winkle had immediate supervisory authority over Plaintiff and had the ability to take tangible employment actions against her.

86. Defendant McClelland submitted his voluntary resignation to ADOC on August 11, 2020.

87. On August 12, 2020, Defendant McClelland was indicted on nine charges for the sexual assault, sexual abuse, and kidnapping of Plaintiff and the prison nurse.

88. On November 13, 2020, the indictment against Defendant McClelland was amended to add six additional charges for the assault, sexual assault, and kidnapping of two more victims, both of whom worked at the prison.

89. As a result of the assaults, physical and verbal sexual harassment, and the hostile work environment to which she was subjected for months, Plaintiff suffered harm to her physical, mental, and emotional wellbeing. She has been diagnosed with post-traumatic stress disorder, has suffered severe emotional distress, humiliation, grief, and fear, and has incurred medical expenses, lost wages, and other economic losses.

90. As a result of the harm to her physical and mental wellbeing occasioned by Defendants' misconduct, Plaintiff took leave from work beginning on August 8, 2020 and has been unable to return to work.

## COUNT ONE
### Title VII – Sex Discrimination/Hostile Work Environment
### (Defendant State of Arizona)

91. The foregoing paragraphs are incorporated as if fully set forth herein.

92. Defendant State of Arizona, through its agents and employees, subjected Plaintiff to a hostile work environment and discrimination based on her sex and gender.

93. The sex discrimination was intentional and created an intimidating, oppressive, offensive, and hostile work environment which interfered with Plaintiff's physical, mental, and emotional well-being and her work performance.

94. The sex discrimination was severe and pervasive based on the nature, frequency, and duration of the harassment, including: (a) at least two instances of sexual assault perpetrated by her supervisor, Defendant McClelland; (b) egregious, derogatory, and humiliating comments of a sexual nature from other supervisors and co-workers; and (c) threats from Warden Jeffrey Van Winkle that he had people watching Plaintiff's social media and that Plaintiff would be reprimanded if she spoke out about the assaults.

95. In addition, Defendant State of Arizona knew or should have known of the sex discrimination and hostile work environment perpetrated by Defendant McClelland and

other employees, and it failed to exercise reasonable care to prevent or promptly correct the discrimination.

96. Defendant State of Arizona failed to adequately supervise, control, discipline, or otherwise penalize employees who engaged in the sex discrimination and harassment described above by failing to take corrective action against such employees and by allowing supervisors such as Defendant McClelland the ability to manipulate or conceal the complaints against them by engaging in the "informal resolution" process.

97. The sex discrimination and hostile work environment would have detrimentally affected a reasonable person in Plaintiff's position.

98. The sex discrimination and hostile work environment did, in fact, detrimentally affect Plaintiff and caused harm to her physical, mental, and emotional well-being.

99. As a result of the hostile work environment and sex discrimination committed by Defendant State of Arizona and its agents and employees, Plaintiff has been diagnosed with post-traumatic stress disorder, has suffered severe emotional distress, humiliation, grief, and fear, and has incurred medical expenses, lost wages, and other economic losses.

### COUNT TWO
### 42 U.S.C. § 1983 – Violation of Equal Protection
### (Defendant Jason McClelland)

100. The foregoing paragraphs are incorporated as if fully set forth herein.

101. Sexual harassment is a form of sex discrimination prohibited by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

102. Defendant McClelland violated Plaintiff's right to equal protection when he sexually harassed and assaulted her in approximately September 2019 and subsequently spread egregious rumors about her which caused her to be subjected to further harassment by other co-workers.

103. Defendant McClelland was acting under the color of state law when he sexually harassed and assaulted Plaintiff because his actions were undertaken while

exercising his responsibilities as a corrections sergeant, member of the TSU Unit, and Plaintiff's supervisor at ASPC – Florence Central Unit.

104. Defendant McClelland was also acting under the color of state law because he abused the authority and position given to him by the State when he committed the assault in a restricted area of the prison known as the Commander's Room, which was not accessible to lower ranking employees.

105. As a result of Defendant McClelland's violation of equal protection under the Fourteenth Amendment, Plaintiff suffered physical, mental, and emotional harm. Plaintiff has been diagnosed with post-traumatic stress disorder, has suffered severe emotional distress, humiliation, grief, and fear, and has incurred medical expenses, lost wages, and other economic losses.

106. Because Defendant McClelland's actions were done knowingly, intentionally, and maliciously, Plaintiff is entitled to recover compensatory and punitive damages.

## COUNT THREE
### 42 U.S.C. § 1983 – Violation of Equal Protection
### (Defendant Van Winkle)

107. The foregoing paragraphs are incorporated as if fully set forth herein.

108. At all times alleged herein, Defendant Van Winkle was a final policymaker for ASPC – Florence Central Unit.

109. After Plaintiff and Defendant McClelland's other victims reported the sexual harassment and assaults in mid-July 2020, Defendant Van Winkle had actual knowledge of Defendant McClelland's unconstitutional and criminal conduct toward Plaintiff.

110. Defendant Van Winkle purposefully discriminated against Plaintiff by intentionally failing to redress Plaintiff's allegations of sexual assault against McClelland.

111. Rather than redress the allegations of sexual assault, Defendant Van Winkle endorsed and supported Defendant McClelland by: (a) allowing Defendant McClelland to remain in his position without restrictions while the CIU investigation occurred, (b) subsequently facilitating McClelland's transfer to a supervisory position at another prison,

(c) refusing to reprimand, discipline, or terminate McClelland, (d) telling McClelland that he would stand by him and support him through the matter, and (e) allowing McClelland to voluntarily resign from his position after he had been arrested.

112. Defendant Van Winkle's discriminatory purpose is further evidenced by the fact that he verbalized support for Defendant McClelland while instructing Plaintiff to refrain from posting about the matter on social media and threatening to reprimand her if she did.

113. Defendant Van Winkle's actions amount to deliberate indifference toward Defendant McClelland's discrimination of Plaintiff and constitute a violation of Plaintiff's right to equal protection under the law.

114. Defendant Van Winkle's deliberate indifference and intentional failure to redress Plaintiff's allegations of sexual harassment and assault caused or contributed to the violation of Plaintiff's right to equal protection under the Fourteenth Amendment, and as a result, Plaintiff suffered physical, mental, and emotional harm, post-traumatic stress disorder, severe emotional distress, humiliation, grief, and fear, and has incurred medical expenses, lost wages, and other economic losses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A. For special and general compensatory damages, including for past and future medical expenses, lost wages, emotional distress, and loss of enjoyment of life;

B. For punitive damages against Defendant McClelland;

C. For attorneys' fees and costs under 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988 to the extent permitted by law;

D. For pre- and post-judgment interest to the extent permitted by law;

E. For fees and expenses, including taxable costs, to the extent permitted by law; and,

F. For such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED: November 11, 2021.

**ROBBINS & CURTIN, p.l.l.c.**

By: /s/ Anne E. Findling
Anne E. Findling
Lauren E. Channell
301 E. Bethany Home, #B-100
Phoenix, Arizona 85012
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 11, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing thereby transmitting a Notice of Electronic Filing to all CM/ECF registrants.

Office of the Arizona Attorney General
Michael K. Goodwin, Ass't. Attorney General
2005 North Central Avenue
Phoenix, AZ   85004-1592
(Email: Michael.goodwin@azag.gov)
*Attorneys for Defendants State of Arizona,
Ryan, Shinn, Van Winkle*

Georgia A. Staton, Attorney;
Ravi V. Patel, Attorney
JONES, SKELTON & HOCHULI
40 North Central
Phoenix, AZ    85004
(Email: gstaton@jshfirm.com
rpatel@jshfirm.com)
*Attorneys for Defendant McClelland*

By: /s/ Linda Hasseler